# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FOAMEX INTERNATIONAL INC., *et al.*, | Case No. 09-10560 (KJC) |
| Debtors. | (Jointly Administered) |
| | Ref. Docket No. 208 |

## OBJECTION OF THE MAJORITY FIRST LIEN LENDERS TO DEBTORS' MOTION TO APPROVE THE SALE OF SUBSTANTIALLY ALL OF THEIR ASSETS

MatlinPatterson Global Opportunities Partners III L.P. and MatlinPatterson Global Opportunities Partners (Cayman) III L.P. (together, "MP"), Bennett Management Corporation, on behalf of its affiliated funds, Black Diamond CLO 2005-1, LTD., Black Diamond CLO 2005-2, LTD., Black Diamond CLO 2006-1(Cayman), LTD., Black Diamond International Funding, LTD. and BDCM Opportunity Fund II, L.P. (collectively, the "Majority First Lien Lenders"), by and through their respective undersigned counsel, hereby submit this objection to the Debtors' Motion for Entry of (I) an Order (A) Approving Bidding Procedures in Connection with Sale of Substantially All of the Debtors' Assets, (B) Approving Break-Up Fee and Expense Reimbursement, (C) Scheduling an Auction and Hearing to Consider the Proposed Sale and Approving the Form and Manner of Notice Thereof, and (D) Establishing Procedures Relating to the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (II) an Order (A) Approving the Proposed Sale, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief

(Docket No. 208) (the "Sale Motion").[1] In support of this objection, the Majority First Lien Lenders respectfully state as follows:

## PRELIMINARY STATEMENT

1. This objection unfortunately has become necessary because the Debtors have chosen to accept a cash offer from a competing bidder that is $5 million lower than a cash bid made by the Majority First Lien Lenders that was subject to a condition that in further bids the Debtors would permit the Agent (defined below) to credit bid the first lien debt to the full extent permitted under section 363(k) with a cash-out option for minority First Lien Lenders (defined below) that elected to not take their pro rata share of the equity in any vehicle created by the Agent to hold the Debtors' assets. In addition, the Majority First Lien Lenders provided additional value by resolving the objections of the second lien lenders and the Official Committee of Unsecured Creditors (the "Committee"). Not surprisingly, the various creditor constituencies want more consideration, not less, object to the Debtors' proposed sale, and join in the Majority First Lien Lenders objection to the Debtors' unilateral decision -- without consulting other creditors or the Committee -- to deny the Majority First Lien Lenders their right to credit bid in violation of the bid procedures order and section 363(k) of the Bankruptcy Code.

2. Since the beginning of these chapter 11 cases, the Debtors' strategy for maximizing value to their estates was to try to sell substantially all of their assets to the highest bidder pursuant to section 363 of the Bankruptcy Code and hope that value at an auction got high enough that their creditors would support their efforts. Initially, the Majority First Lien Lenders were willing to participate in the Debtors' sales process and an affiliate of MP agreed to fund the Debtors' chapter 11 cases to get through a sales process. By their actions at Tuesday's auction, however, the Debtors apparently abandoned their strategy and selected as the winning bid an

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Sale Motion.

offer from Wayzata Capital Investment Partners LLC ("Wayzata") that was neither higher nor better for their estates or their creditor constituencies simply because it was a cash bid. Accordingly, the Debtors now find themselves propounding a sale that is not supported by any of their constituencies.

3.  The fatal flaw in the Debtors' sales process occurred when the Debtors deviated from their bid procedures and the Bankruptcy Code and unilaterally rejected the efforts of the Agent (as defined in the Term Loan Credit Agreement) under the First Lien Term Credit Agreement, dated as of February 12, 2007 (as amended, the "Term Loan Credit Agreement") to exercise the right of the lenders thereunder (collectively, the "First Lien Lenders") to credit bid up to full value of the first lien debt at the auction and obtain the collateral that secured the first lien debt. That escape hatch – the right of any first lien lender to exercise its rights under section 363(k) if the auction turned out not to be the best way to maximize value –was never supposed to be compromised by the sales process – even for those that chose to participate in the auction on their own behalf. Instead, that right was expressly reserved in the bid procedures.

4.  Notwithstanding the bidding procedures and section 363(k), the Debtors failed to permit the Agent for the First Lien Term Lenders to submit a credit bid on behalf of all of the First Lien Lenders. The right of the Agent to make such a credit bid, even in the face of a small group of dissenting holders, has been widely recognized, including most recently by Judge Walsh in In re GWLS Holdings, Inc., No. 08-12430, 2009 WL 453110 (Bankr. D. Del. 2009). Therefore, it should not have been unilaterally denied by the Debtors at the auction. Instead, to preserve their rights as secured lenders, the Majority First Lien Lenders were forced to condition their last bid – a bid that was $5 million higher than the Wayzata bid – on the Debtors agreeing to permit credit bids from the Agent going forward. Otherwise, the Majority First Lien Lenders

would be in the untenable position of having to continue to bid for equity they already own. The Debtors cannot now try, through this sales process, to penalize the Majority First Lien Lenders by forcing them (and all other objecting creditor groups) to take a lower payout offered by Wayzata in cash and, thereby, deny them of their rights simply because they participated in the Debtors' flawed auction process. Accordingly, the instant Sale Motion and the Wayzata offer necessarily fail.

5. As this Court indicated at the Bidding Procedures Hearing, in connection with approval of any sale of the Debtors' assets under section 363 of the Bankruptcy Code, this Court would look to the Debtors to demonstrate how these chapter 11 cases end. Approval of the Wayzata bid will not bring these cases any closer to culmination. To the contrary, the Wayzata bid is being contested by each of the Debtors' significant creditor constituencies. The Majority First Lien Lenders, however, have the support of all of the Debtors' significant creditor constituencies and, if approved by the Court, could close a credit bid transaction supported by substantially all within several weeks. In the absence of any support from those creditors that the Debtors owe fiduciary duties to, it is perplexing why the Debtors continue to propound their lower bid. Manifestly, however, the Sale Motion as currently proposed by the Debtors should be denied and the Agent should be permitted to credit bid its claims and take its collateral, unless Wayzata is prepared to bid in excess of the full value of the first lien claims.

## BACKGROUND

6. On February 18, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with this Court. The Debtors continue to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.  As of the Petition Date, the Debtors' were indebted to the First Lien Lenders under the Term Loan Credit Agreement in the principal amount of approximately $324.8 million, plus accrued and unpaid interest thereon and fees and expenses. The obligations under the Term Loan Credit Agreement are secured by perfected prepetition first priority liens on all or substantially all of the Debtors' property, plant and equipment, and a second priority lien on the Debtors' accounts receivables, junior only to the liens of the agent under the Debtors' DIP Financing (defined below). The Majority First Lien Lenders collectively hold more than a majority of the debt outstanding under the Term Loan Credit Agreement.

8.  On March 19, 2009, the Court entered a final order approving debtor in possession financing provided by MP Foam DIP LLC ("MP Foam"), an affiliate of MP. The DIP Financing is secured by a priming, senior lien on the Debtors' accounts receivables.

9.  On April 9, 2009, the Court entered an order approving bid procedures for the sale of substantially all of the Debtors' assets (the "Bidding Procedures Order"). Among other things, the bid procedures acknowledged and preserved the right of "[o]ther bidders . . . to credit their secured claims as and to the extent set forth in section 363(k) of the Bankruptcy Code."

10. On May 19, 2009, the Debtors conducted an auction for the sale of substantially all of their assets. At the conclusion of that auction, the Debtors selected the bid from Wayzata as the highest and best bid. In doing so, the Debtors rejected the bid of MP Foam to pay $146.5 million in cash ($5 million higher than the Wayzata bid) on the condition that in further bids the Debtors would permit the Agent to credit bid the first lien debt to the full extent permitted under section 363(k) with a cash-out option for minority First Lien Lenders that elected to not take their pro rata share of the equity in any vehicle created by the Agent to hold the Debtors' assets.

# OBJECTION

## A. The Agent Had The Right to Credit Bid at the Auction

11. Section 363(b) provides a debtor with authority to "use, sell, or lease" its property, other than in the ordinary course of business under certain emergency circumstances. See 11 U.S.C. § 363(b)(1). Section 363(k), however, provides that, "[a]t a sale under subsection [363(b)] of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k).

12. The right to credit bid is an important protection afforded to a secured creditor — especially an undersecured creditor whose collateral is being liquidated during the course of a bankruptcy case. By allowing that creditor to credit bid its claim, the Bankruptcy Code preserves the secured creditor's bargain by ensuring that either its debt is paid in full or the collateral stands in its place. The right to credit bid is unequivocal; the secured creditor is permitted to bid the full amount of its allowed claim regardless of the underlying value of it collateral. See Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.), 432 F.3d 448 (3d Cir. 2006) (finding "that [363(k)] empowers creditors to bid the total *face* value of their claims – it does not limit bids to claims' economic value") (emphasis added).

13. At the Debtors' auction, the Debtors refused to acknowledge or even ascribe value to the ability of the Agent to credit bid its secured claims under the Term Loan Credit Agreement. They did so even though MP Foam provided the Debtors with advance notice that the Required Lenders intended to direct the Agent to credit bid at the auction and written evidence that the Agent was prepared to credit bid as directed by the Required Lenders (as defined in the Term Loan Credit Agreement). The Debtors did not attempt to contact the Agent

and did not accept the credit bid submitted by the Required Lenders, at whose direction the Agent acts. Instead, the Debtors boldly required MP Foam to backstop any credit bid of the Agent in cash – a request that is wholly at odds with the policy behind section 363(k). That the Debtors were unable to maximize value in this way or obtain significant creditor support is, therefore, not surprising.

14. The Debtors have no basis under the Bankruptcy Code or otherwise to prohibit the making of a credit bid while at the same time accepting what will have amounted to a lower cash bid from Wayzata. Fundamentally, a credit bid by the Agent of up to $325 million would have been the equivalent of a cash purchase at the same amount. In re Finova Capital Corp., 356 B.R. 609, 625 (Bankr. D. Del. 2006) (stating that "it is ultimately inconsequential whether a secured creditor pays with cash or with the reduction of debt"); Spillman Development Group, Ltd. v. America Bank of Texas (In re Spillman Development Group, Ltd.), 401 B.R. 240, 253 (Bankr. W.D. Tex. 2009) (finding that a lender's purchase of the debtor's assets by credit bid "is the equivalent of a cash purchase"). And that bid is undoubtedly higher and better than the Wayzata bid.

15. Moreover, no cause exists to deny the Agent the right to credit bid for the Debtors' assets. In determining whether cause to deny a credit bid exists, courts have considered several factors, such as (i) notice to other parties in interest, especially other secured creditors, (ii) the ability of the credit bidder to provide a deposit or other form of protection to the estate in case the credit bidder's lien is subsequently successfully challenged, and (iii) the adequacy of the purchase price. See e.g. In re Takeout Taxi Holdings, Inc., 307 B.R. 525 (Bankr. E.D. Va. 2004) (denying the sale because of a defective notice of hearing to the other secured creditors); In re Diebart Bancroft, 1993 WL 21423 (E.D. La. Jan. 26, 1993) (requiring a ten percent cash deposit

to hold in escrow given a pending lien dispute); In re Theroux, 169 B.R. 498 (Bankr. D. R.I. 1994) (denying the sale due to a "blatant inadequacy of the price").

16. Here, the notice of the sale specifically told secured creditors that they would be permitted to credit bid at the auction, so obviously lack of notice cannot be a reason to deny the credit bid. Nor can a lack of a cash deposit. MP Foam has posted a $10 million deposit. In addition, the Debtors have already stipulated that the obligations outstanding under the Term Loan Credit Agreement are valid. And, as set forth above, the adequacy of the purchase price if a credit bid was permitted has not and, indeed, cannot be challenged -- there is no indication that Wayzata or any other bidder would bid in excess of the value of the first lien claims. Therefore, no cause can exist to deprive the Agent and the Majority First Lien Lenders of their right to <u>choose</u> to credit their claims for equity in a business they already own!

### B. The Agent Had The Right to Credit Bid on Behalf of All First Lien Lenders

17. Not only did the Agent have the right and opted to credit bid under the Bankruptcy Code and the Bidding Procedures to get its collateral, the Agent's credit bid was sufficient to bind all lenders -- even those who opposed the Agent exercising the credit bid option. The Majority First Lien Lenders did so and, therefore, the Agent's agreement to credit bid was proper.

18. Under the Term Loan Credit Agreement, upon and during an event of default, only the Collateral Agent (as defined in the Term Loan Credit Agreement) has the authority to exercise remedies with respect to the Pledged Collateral (as defined in the Term Loan Credit Agreement), including "taking possession of the Pledged Collateral or any part thereof", the right to "demand, sue for, collect or receive any money or property at any time payable or receivable in respect of the Pledged Collateral" and the right to "take possession of the Pledged Collateral or any part thereof." Security Agreement dated February 12, 2007, at Sections 9.1(i), (ii) and (iv).

As a result, the Agent's power to act on behalf of all lenders permits it to bind even dissenting holders to its actions. Therefore, the Agent had the right and the authority to credit bid and that right was unequivocal. See In re GWLS Holdings, Inc., No. 08-12430, 2009 WL 453110 (Bankr. D. Del. Feb. 23, 2009) (finding that at the request of the majority lenders, the agent can credit bid for all first lien lenders without unanimous consent and to do so free and clear of the dissenting lender's liens). See also Beal Savings Bank v. Sommer, 865 N.E.2d 1210 (N.Y. 2007) (finding that where the language of the operative agreements reflected that the lenders contemplated unified action by the agent, one lender could not act independently to contravene the will of the other lenders); In re Enron Corp., No. 04 Civ. 1367 (NRB), 04 CIV 1498 (NRB), 04 Civ. 1995 (NRB), 04 CIV. 1496 (NRB), 2005 WL 356985 (S.D.N.Y. Feb 15, 2005) (affirming bankruptcy court's conclusion that an individual lender lacked standing to pursue remedies that were irrevocably transferred to the collateral agent for its benefit and the benefit of the lending group as a whole); Credit Francais Int'l, S.A. v. Sociedad Financiera De Comerico, 490 N.Y.S.2d 670, 681-82 (1985) (holding that "[w]hen parties have agreed to operate through an agent or as a collective entity, whether it be a corporation, a partnership, a syndicate or a consortium, a unitary body is created, and only unitary action can be permitted"). Other than their preference for a cash bid at all costs, the Debtors have not demonstrated any valid basis for why they unilaterally chose to take that right away. Again, given the lack of any support for its current sale, the Debtors' actions at the auction are circumspect.

## RESERVATION OF RIGHTS

19. The Majority First Lien Lenders hereby adopt the arguments of the First Lien Lenders and the Law Debenture Trust Company of New York, in its capacity as administrative agent under the Second Lien Credit Agreement, dated February 12, 2007, with respect to the

Debtors' failure to satisfy section 363(f) of the Bankruptcy Code, as outlined in their respective objections to the Debtors' Sale Motion, and reserve the right to object to the Sale Motion on such grounds and on any other grounds at the hearing to consider the proposed sale.

20. The Majority First Lien Lenders reserve the right to revise, amend or supplement this Objection at any time, including, with the consent of the Court, at the hearing to approve the Sale Motion or at any subsequent hearing.

## **CONCLUSION**

WHEREFORE, for the reasons stated above, the Majority First Lien Lenders respectfully request that this Court deny the proposed sale to Wayzata, permit the Agent to credit bid the claims under the Term Loan Credit Agreement pursuant to section 363(k) and grant such additional relief as the Court deems just and proper.

Date: May 21, 2009
New York, New York

*[Signature pages follow.]*

**RICHARDS, LAYTON AND FINGER, PA**

By: /s/ Russell C. Silberglied
Russell C. Silberglied (No. 3462)
Andrew Irgens (No. 5193)
P.O. Box 551
Wilmington, DE 19899
Telephone: (302) 6511-770

-and-

**BRACEWELL & GIULIANI LLP**

Jennifer Feldsher
1177 Avenue of the Americas
New York, NY 10036-2714
Telephone: (212) 508-6137
Facsimile: (212) 938-3837

*Attorneys for MatlinPatterson Global Opportunities Partners III L.P. and MatlinPatterson Global Opportunities Partners (Cayman) III L.P.*

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**

Patrick J. Nash, Jr.
Stephen S. Neuman
333 West Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 407-0700
Facsimile: (312) 407-0411

*Attorneys for Black Diamond CLO 2005-1, LTD., Black Diamond CLO 2005-2, LTD., Black Diamond CLO 2006-1 (Cayman), LTD., Black Diamond International Funding, LTD. and BDCM Opportunity Fund II, L.P.*

**CLIFFORD CHANCE US LLP**

Jennifer C. DeMarco
John A. Healy
31 W. 52nd Street
New York, NY 10019
Telephone: (212) 878-8000
Facsimile: (212) 878-8375

*Attorneys for Bennett Management Corporation, on behalf of its affiliated funds*