# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>FOAMEX INTERNATIONAL, INC., et al.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 09-10560 (KJC)<br>Joint Administration<br><br>**Re: Docket No. 208**<br><br>**Hearing Date: May 26, 2009 at 1:00 p.m.**<br>**Objection Date: May 26, 2009 at 1:00 p.m.** |

## OBJECTION OF WAYZATA INVESTMENT PARTNERS LLC, WAYZATA OPPORTUNITIES FUND II, L.P. AND FOAM HOLDINGS, LLC TO DEBTORS' MOTION TO APPROVE SALE OF SUBSTANTIALLY ALL OF THEIR ASSETS

### INTRODUCTION

1. Wayzata Investment Partners LLC, Wayzata Opportunities Fund II, L.P. and Foam Holdings, LLC (collectively, "Wayzata") hereby object to the Debtors' motion to approve the sale of substantially all their assets to MP Foam DIP LLC ("MP Foam"), an entity formed by MatlinPatterson Global Advisers LLC ("MP"). MP purports to control, in combination with a group that also includes Black Diamond and Bennett Management, a slight majority of the First-Lien Loans, as defined below (collectively, the "51% MP Lender Group").

2. At the suspension of the auction re-opened by the Court on May 21, even though Wayzata's latest bid of $151.5 million in cash would have yielded a higher cash payout for creditors, the Debtors accepted a purported credit bid from Bank of New York Mellon

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Foamex International, Inc. (3908); Foamex, L.P. (5617); Foamex Latin America, Inc. (4053); Foamex Asia, Inc. (9431); FMXI, LLC (9496); Foamex Carpet Cushion LLC (2280); Foamex Mexico, Inc. (8685); and Foamex Canada Inc. (5846). The Debtors' principal office (other than that of Foamex Canada Inc.) is located at Rose Tree Corporate Center II, 1400 N. Providence Road, Suite 2000, Media, PA 19063-2067. Foamex Canada Inc.'s address is 8355 Jeanne Mance Street, Montreal, Quebec, Canada H2P2Y1.

{00299819;v1}

("BONY"), as Administrative Agent for the first-lien lenders (the "Lenders"), on behalf of the newly-formed purchaser and at the direction of the 51% MP Lender Group, for $155 million of credit against the First-Lien Loans. All the Lenders are being forced to receive equity with indeterminate rights in a newly-formed and unknown purchaser, subject only to a diluted "cash out" option based on an arbitrary transaction value of $146.5 million available for dissenting Lenders (including, at a minimum, Wayzata Opportunities Fund II, L.P., which holds approximately 5% of those loans, and a separate Lender group holding approximately 35% of those loans (the "35% Lender Group")). A cash transaction of $146.5 million would lead to an expected cash recovery of only 18.8% for the Lenders, whereas Wayzata's bid would lead to a $5 million greater cash recovery, i.e., 20.4%, for the Lenders. The higher Wayzata cash offer represents an 8.5% greater recovery on the already severely impaired First-Lien Loans.

3. Dissenting Lenders will receive less value and will be unfairly treated under the MP offer, because the cash option by its terms is calculated on the basis of a cash transaction arbitrarily deemed to be worth $146.5 million -- substantially less than both the stated MP bid of $155 million and the latest Wayzata bid of $151.5 million in cash. The minority equity and cash offered as alternatives each would have less value than the shares of equity to be owned principally by the 51% MP Lender Group. The value of unregistered minority investments should be substantially discounted relative to that of controlling or liquid investments.

4. Although, due to technical difficulties, the transcript unfortunately does not reflect all of the comments made at the resumed auction, the Debtors stated that they were valuing the purported dollar amount of credit bids as being equal to cash bids, despite the fact that MP's bids had arbitrarily capped the "cash out" option for dissenting Lenders. Moreover, MP made it clear that the $146.5 million basis for the cash-out option would not increase as MP continued to

credit bid. In essence, the Debtors have allowed MP to bid further even though MP's purportedly higher bids deliver no additional value to secured creditors beyond the value of the arbitrarily capped "cash out" option. Put another way, by not requiring MP to provide a cash-out option to dissenting Lenders at a price that reflects the full amount of their stated bid, the Debtors have created a bidding environment in which MP can increase its bid with no corresponding increase in economic recovery for dissenting Lenders. Thus, for example, even if Wayzata were to make a $292 million cash bid that would provide all Lenders with a 90% cash recovery, the Debtors would declare MP the winner of the auction with a credit bid of $295 million, leaving dissenting Lenders with a choice between an 18.8% cash recovery or taking a minority stake in a newly-formed entity with no incremental value beyond whatever value exists at their current $155 million credit bid.

5. If the Court simply requires that MP provide a cash-out option to dissenting Lenders on a cash-equivalent basis equal to the stated amount of its credit bid, such that value to creditors could actually be equal in comparing the bids of Wayzata and MP, the auction can be resumed on an equal playing field that will yield a higher and better recovery to all Lenders.

6. Wayzata suspended bidding only because it was evident that the Debtors would permit MP to keep increasing its credit bid without increasing the corresponding notional cash basis for the "cash out" option to receiving equity securities. This made the auction process futile. The Debtors' financial advisor acknowledged at the resumed auction that if MP continued to credit bid, Wayzata would need to bid, in cash, an amount in excess of the first-lien indebtedness of approximately $324.8 million (which would include Wayzata Opportunities Fund II, L.P.'s portion of the First-Lien Loans). This chilled the bidding, as no further Wayzata

bids, regardless of the amount, could be "higher and better" than an MP credit bid until that $324.8 million threshold was surpassed.

7. If the auction process is to provide for a cash recovery to dissenting Lenders based on a notional value equal to the full amount of the credit bid (which, if based on appropriate assumptions, is the true measure of the "value" to creditors of that bid in these circumstances), Wayzata is prepared to increase its cash bid beyond $151.5 million. Because the process did not so provide, Wayzata elected to suspend bidding until the Court could rule on this matter, even though Wayzata is prepared to deliver future bids that would ensure a greater cash recovery to creditors.

8. The proposed transaction's flawed structure appears to reflect the 51% MP Lender Group's fundamental misapprehension as to their entitlement to the Debtors' assets and as to the Chapter 11 process. Apparently oblivious to the claims and the liens of the dissenting Lenders, the 51% MP Lender Group has stated repeatedly that it alone already owns the Debtors' business. See Transcript of Auction, May 19, 2009 ("Auction Tr. I") ("[T]his is already our business[.]"); Objection of the Majority First Lien Lenders to Debtors' Motion to Approve the Sale of Substantially All of Their Assets, dated May 21, 2009 ("MP Obj."), ¶ 16 (citing purported right of Administrative Agent "and the Majority First Lien Lenders . . . to choose to credit their claims for equity in a business they already own") (emphasis omitted).

9. The treatment of MP's bidding chilled other legitimate bidding and eliminated the potential for additional value to the estate and its creditors. This result is not consistent with the duty to maximize value to the estate. See Part I.A below. Nor does 11 U.S.C. § 363(k) compel such an irrational result. That statute permits a secured lender to obtain collateral by credit bidding. It does not permit a group of lenders to appropriate value from other lenders in a

syndicate by giving them the unreasonable choice between accepting minority shares with indeterminate rights in an entity created to purchase collateral -- necessarily worth less than the controlling shares -- or accepting cash based on an assumed all-cash transaction in an arbitrary amount that is less than both the last all-cash bid in the auction and the amount of the purportedly winning credit bid. Such a transaction would effectively coerce Lenders into accepting the arbitrarily discounted "cash out" option, which is unfair and is required neither by statute nor by the Court's directive on May 21 that the Administrative Agent be allowed to credit bid. See Part I.B below.

10. In any case, forcing Lenders through a Section 363 sale to accept unregistered equity interests with indeterminate rights in a newly-formed company, to be controlled by MP or the 51% MP Lender Group, in exchange for secured indebtedness, is not permissible under the Bankruptcy Code or the loan documents. Given these features, the transaction that MP seeks is in fact a plan of reorganization, impermissibly proposed to be adopted without observing Chapter 11's requirements for confirmation. See Part II.A below. Those requirements are more than formalities -- they would serve important purposes here such as informing creditors about a proposal that currently is largely a mystery and permitting a class of impaired creditors -- approximately 49% of which is owned by Lenders that are not part of MP's group -- to vote on its adoption. MP is essentially trying to confirm a plan without its acceptance by holders of two-thirds of the First-Lien Loans. See Part II.B below. Finally, the proposed transaction flies in the face of the Credit Agreement, which, among other things, requires equal and ratable distributions and sharing of proceeds among the Lenders and forbids forgiving the loans or changing the form of payment without the prior consent of each affected Lender. See Part II.C below.

## STATEMENT OF FACTS

11. The Debtors filed the above-referenced voluntary Chapter 11 petitions (the "Bankruptcy Cases") on February 18, 2009 (the "Petition Date") and are operating their businesses as debtors in possession. By an order entered on April 9, 2009, the Court approved bidding procedures in connection with the sale of substantially all of the Debtors' assets under 11 U.S.C. § 363(b).

12. As of the Petition Date, under a First Lien Term Credit Agreement dated as of February 12, 2007 (the "Credit Agreement"), term loans in an aggregate principal amount of $324.8 million (the "First-Lien Loans") secured under a Security Agreement of the same date (the "Security Agreement") by first-priority liens in certain of the Debtors' assets (not including interests in certain Mexican subsidiaries) were outstanding. Also outstanding were second-lien term loans in an aggregate principal amount of $47.1 million.

13. The 51% MP Lender Group asserts that it owns approximately 51% of the First-Lien Loans. The 35% Lender Group and Wayzata Opportunities Fund II, L.P. own approximately 35% and 5% of the First-Lien Loans, respectively.

14. On May 15, 2009, Foam Holdings, LLC, an entity formed by Wayzata Investment Partners LLC to purchase the assets, in accordance with the bidding procedures, submitted a qualified bid to purchase the assets for $110.5 million in cash.

15. Accordingly, on May 19, 2009, the Debtors held an auction. In numerous rounds of bidding initially involving three bidders, Wayzata ultimately made a cash bid of $141.5 million that the Debtors determined to be the highest and best bid. See Auction Tr. I, at 85, 103. MP represented that the 51% MP Lender Group owned 51% of the First-Lien Loans and were directing BONY, as Administrative Agent, to credit bid all of the Lenders' claims in respect of

those loans. Id. at 33-35, 59. MP indicated that as a result, all holders of those claims would receive only equity in the special-purpose entity that would purchase the assets. Id. at 37; see also id. at 44-45, 81. Wayzata and the 35% Lender Group opposed, as they still do, the 51% MP Lender Group's assertion that it could direct the Administrative Agent to credit bid the claims of dissenting Lenders. See id.

16. The Debtors rejected MP's proffered credit bid and MP then continued to bid, purporting to reserve its right to credit bid all Lenders' claims. Id. at 39-46, 50-65. Counsel for the 35% Lender Group reserved his clients' rights to object to such a bid involving their receipt of "unknown equity in a new company" with unknown control rights and shareholder agreements, instead of cash. Id. at 62; see also id. at 71-72 (arguing that any "cash out option", if credit were bid, would have to be for cash equivalent of credit bid).

17. In the auction on May 19, the 51% MP Lender Group initially refused to provide other Lenders with any "cash out" option to receiving equity in connection with the 51% MP Lender Group's purported credit bids, but later submitted a $146 million bid with an equivalent "cash out" option to electing Lenders on the condition that subsequent credit bids be permitted to carry a "cash out" option limited to distributions based on an assumed cash price of $146 million. See id. at 97-101. The Debtors rejected that bid because the procedures required bids to be unconditional. See id. at 102-03.

18. On May 20, 2009, MP agreed to a settlement with the second-lien lenders and the Official Committee of Unsecured Creditors (the "Committee") under which MP would pay the second-lien lenders $500,000 for professional fees, additional cash of $500,000, and warrants for 4% of MP Foam's common equity, and the purchaser would assume and release all claims under

Chapter 5 of the Bankruptcy Code. In return, the second-lien lenders would withdraw their appeal with respect to payments to certain critical vendors.

19. Following a hearing on May 21, 2009, at which the parties -- including the 35% Lender Group that supported and still supports Wayzata's bid in the auction -- argued their respective positions, the Court directed that the auction be re-opened. In so doing, the Court stated that more value was to be had for the estate in continuing the auction and further stated that the Administrative Agent would be allowed to credit bid if it so chose. However, the Court deferred to the Debtors on how the auction would proceed, and whether additional rules were warranted in regard to credit bidding. Arguments over the propriety of such bidding and the value of a credit bid were left for subsequent hearings. During that hearing, the Committee indicated that it took a neutral position as between Wayzata's and MP's bids.

20. Later that day, in the re-opened auction, MP submitted a $146.5 million all-cash bid, but stated that any higher bids would include a credit-bid component -- which the 51% MP Lender Group purportedly had the right to effect by directing BONY, as Administrative Agent, to credit bid all Lenders' claims. See Transcript of Auction, May 21, 2009, at 4-7 ("Auction Tr. II"). Wayzata then raised its cash bid to $151.5 million. Id. at 11.

21. MP thereafter purported to submit a $155 million credit bid with a "cash out" option for dissenting Lenders limited to distributions based on an assumed cash price of $146.5 million. Id. at 18-20.

22. The Debtors stated that -- despite the fact that Lenders would realize less cash under MP's offer than under Wayzata's -- they attributed more value to MP's purported credit bid. The Debtors further stated that Wayzata would have to make a cash bid of $156.85 million to outbid MP's $155 million credit bid (plus the purported value to the estate of settlement

distributions that MP agreed to pay to second-lien lenders) and ultimately would need to bid in cash the full face value of the First-Lien Loans' face amount of $324.8 million to prevail if MP kept increasing its purported credit bid. Faced with this fundamentally flawed methodology, the effect of which is to chill bids that would maximize real value and to permit the 51% MP Lender Group to misappropriate value from Wayzata Opportunities Fund II, L.P., the 35% Lender Group and any other dissenting Lenders, Wayzata, reserving its rights, suspended further bidding pending a ruling from the Court on this objection.

## ARGUMENT

### I. THE PROPOSED SALE YIELDS LESS VALUE TO CREDITORS THAN A SALE TO WAYZATA AND IS INCONSISTENT WITH THE BANKRUPTCY CODE

#### A. A Sale Under a Structure That Cashes Out Dissenting Lenders at a Discount Would Provide Demonstrably Less Value Than Wayzata's Last Offer

23. Rather than providing the highest and best offer from the point of view of return to creditors, a sale to MP would yield measurably less value to secured creditors because it includes a cash-out option at an assumed cash value limited to $146.5 million even though the stated amount of the bid is $155 million. That assumed value, and the resulting return to Lenders, is necessarily less than the value and return that would be derived from Wayzata's most recent cash bid of $151.5 million. (Attached as Exhibit A is a comparative analysis of MP's cash-out option and Wayzata's most recent cash offer.) Accordingly, under the most objective measure of value to secured creditors -- the expected cash return -- the proposed transaction is deficient.

24. The Debtors acknowledged that even if Wayzata made a cash bid of 90% of the amount of the First-Lien Loans -- or any other amount short of the loans' total face amount of

$324.8 million -- the Debtors still would accept MP's ever-increasing bids based on a credit against the First-Lien Loans of which it controls a narrow majority.

25. Despite the unfair discount resulting from the cap on the cash option, the dissenting First Lien Lenders would be highly exposed were they to accept unregistered securities in an entity that as yet is undefined as to, among other things, capital structure, cash funding, ownership and control, governance, shareholder protections, and anti-dilution rights (and, as a Delaware limited liability company, is not subject to meaningful minority rights unless agreed by the controlling parties). In any case, given their minority status and illiquidity, the value of those securities would be deeply discounted. See, e.g., Morrow v. Martschink, 922 F. Supp. 1093, 1104 (D.S.C. 1995) (citing "20% minority discount"); Armstrong v. LaSalle Bank, 446 F.3d 728, 734 (7th Cir. 2006) (explaining illiquidity discount), citing Z. Christopher Mercer, A Primer on the Quantitative Marketability Discount Model, CPA Journal, July 2003 ("appropriate marketability discount is approximately 35%"). As such, the proposed transaction effectively coerces dissenting Lenders into accepting the discounted "cash out" option.

26. When seeking approval of a sale under 11 U.S.C. § 363(b), the debtor must maximize the value of the estate. See Myers v. Martin (In re Martin), 91 F.3d 389, 394 (3d Cir. 1996) ("[I]t is the trustee's duty to both the debtor and the creditor to realize from the estate all that is possible for distribution among the creditors.") (citation omitted); see also Cello Bag Co. v. Champion Int'l Corp. (In re Atlanta Packaging Products, Inc.), 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988) ("It is a well-established principle of bankruptcy law that the objective of bankruptcy sales and the trustee's duty with respect to such sales is to obtain the highest or greatest overall benefit possible for the estate.").

27. For the reasons given above, under both the equity and the cash alternatives included in MP's offer, secured creditors would derive less value than they would under Wayzata's cash offer. Thus, the proposed transaction does not properly reflect the highest and best offer and fails to maximize value for secured creditors.

### B. Neither Section 363(k) nor In re SubMicron Dictates Acceptance of a Credit Bid Where the Resulting Transaction Deprives Dissenting Creditors of Additional Value and Their Collateral

28. In the face of this obviously irrational result, the 51% MP Lender Group states that a secured lender may use the "escape hatch" of a credit bid under 11 U.S.C. § 363(k) where the auction "is not the best way to maximize value." See MP Obj. ¶ 3. Far from resorting to an "escape hatch" as might occur where lenders choose to credit bid their claims and instead obtain the collateral, here the 51% MP Lender Group improperly seeks to use Section 363(k) to affirmatively misappropriate value from the dissenting Lenders' secured claims, including those of Wayzata Opportunities Fund II, L.P. and the 35% Lender Group, and to effectively coerce those Lenders into taking the discounted "cash out" option.

29. Where secured creditors buy collateral, a "credit bid merely saves a step of payment by the lender, as buyer, to the lender, as seller"; thus, it is in fact "ultimately inconsequential whether a secured creditor pays with cash or with the reduction of debt." In re FINOVA Capital Corp., 356 B.R. 609, 625-26 (Bankr. D. Del. 2006). Accordingly, credit bidding was permitted in Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys.), 432 F.3d 448 (3d Cir. 2006), where the three secured creditors *agreed* to contribute their claims to a purchasing entity and cause that entity to acquire assets by credit bidding. Here, however, the dissenting Lenders are not looking to obtain collateral through a credit bid -- they recognize that MP's proposal would not obtain the collateral for them at all and in fact would yield less value

(and their lost value would be improperly appropriated by the 51% MP Lender Group). This warrants a different result than in SubMicron. Attributing equivalent economic value to credit bids is economically sound where a single lender or a unanimous group of lenders credit bids and takes receipt of the collateral for the benefit of that lender or for the ratable benefit of all of those lenders, but not where a narrow majority of a syndicate of lenders seeks to use credit bidding to take the value of collateral away from other members of the syndicate. As explained below, doing so here also violates several provisions of the Credit Agreement.

30.  MP incorrectly states that "[t]he right to credit bid is unequivocal" given SubMicron. See MP Obj. ¶ 12. MP fails to mention that the court in SubMicron was overruling objections of an unsecured creditors committee -- not the objections of fellow pari passu secured lenders. The situation in this case is plainly distinguishable. In any event, there is "no absolute entitlement to credit bid"; Section 363(k) only permits credit bidding "unless the court for cause orders otherwise." In re Theroux, 169 B.R. 498, 499 n.3 (Bankr. D.R.I. 1994); see also In re Takeout Taxi Holdings, Inc., 307 B.R. 525, 536 (Bankr. E.D. Va. 2004) (court may deny credit bid for cause); In re Diebart Bancroft, Nos. 92-3744, 92-3745, 1993 WL 21423 (E.D. La. Jan. 26, 1993) (denying credit bid for cause); In re NJ Affordable Homes Corp., No. 05-60442-DHS, 2006 WL 2128624 at *16 (Bankr. D.N.J. June 29, 2006) (cause is "flexible concept enabling a court to fashion an appropriate remedy on a case-by-case basis"). Nor, in any event, does SubMicron limit the Debtors' obligation to maximize value for the estate. See supra ¶ 26 (citing authorities).

31.  Here, the 51% MP Lender Group's misuse of credit bidding has chilled the bidding process and threatens to reduce the real amount of recovery by creditors, which is more than ample cause to deny or restrict such bidding. See 3 Collier on Bankruptcy ¶ 363.09[1] (15th

rev. ed. 2009) (court may deny credit bid for cause where, among other things, "permitting the lienholder to bid would chill the bidding process"); cf. Condor One, Inc. v. Moonraker Assoc. (In re Moonraker Assoc.), 200 B.R. 950, 955 (Bankr. N.D. Ga. 1996) (citing circumstance in which allowing credit bidding amounted to "declaring a winner in a one-horse race").[2]

II. **FORCING THE DISSENTING LENDERS TO ACCEPT A MINORITY EQUITY STAKE IN A COMPANY TO BE CONTROLLED BY THE 51% MP LENDER GROUP IS BOTH STATUTORILY AND CONTRACTUALLY IMPERMISSIBLE**

   A. **Requiring Dissenting Lenders to Accept Unregistered Equity Securities or a Discounted Cash Amount Would Impermissibly Circumvent the Statutory Scheme**

   32. The proposed transaction would exchange collateral for the First-Lien Loans, including those of the dissenting Lenders, for unregistered equity securities in an unknown company to be controlled by MP. This impermissibly circumvents the scheme of Chapter 11 of the Bankruptcy Code, which subjects a proposed reorganization to specific requirements such as disclosure and voting by classes of claims.

   33. Section 363(b) may not be used "to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan sub rosa in connection with the sale of assets." PBGC v. Braniff Airways (In re Braniff Airways), 700 F.2d 935, 940 (5th Cir. 1983); see also In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 885 (Bankr. S.D.N.Y. 1990) ("major pre-confirmation transactions" including § 363 sales raise

---

[2] Moreover, Section 363(k) by its terms does not allow a credit bid under the transaction structure apparently being proposed. In a § 363(b) sale, "the holder" of an allowed claim may offset the claim against the purchase price "if the holder of such claim purchases such property". 11 U.S.C. § 363(k). Although the proposed transaction's mechanics have not been explained here, whether the claims are deemed to be held by the Lenders or by the Administrative Agent, the purchaser would be a different entity -- a special-purpose vehicle created by MP, so the statute would not apply. Cf. Auction Tr. II at 20-21 (clarification, at BONY's request, that no cash would come from BONY). Accepting a credit bid yields a particularly anomalous result where, as here, Wayzata's claim is being bid against Wayzata and under MP's proposed transaction that claim will receive a lesser distribution than the value implied by the most recent all-cash bid. Moreover, if a contribution of claims to the purchaser entity (as in SubMicron, cited above) is envisioned, MP has cited no authority for making that contribution without the dissenting Lenders' consent.

concern that "scheme of Chapter 11 will be distorted"; "transaction which would effect a lock-up of the terms of a plan will not be permitted") (citing cases).

34. The foregoing limitations have specifically been held to preclude in-kind distribution of equity securities to first-lien lenders in a Section 363 sale of secured property. Contrarian Funds, LLC v. WestPoint Stevens, Inc. (In re Westpoint Stevens, Inc.), 333 B.R. 30, 34 (S.D.N.Y. 2005), upheld a challenge by first-lien lenders of "the in-kind distribution, claim satisfaction and release provisions of a [§ 363] Sale Order" that effectively converted their "secured monetary claims . . . into an illiquid minority equity interest in the parent of successor entities" controlled by a bidding group. Such a sale, the court held, "clearly constituted an attempt to determine or preempt plan issues in the context of the Section 363(b) sale and was improper." Id. at 52. It would likewise be improper here to require Lenders, as part of a Section 363(b) sale, to exchange their claims and liens for equity in an entity to be controlled by the 51% MP Lender Group (or for a discounted cash amount).[3]

**B. The Debtors' and MP's Attempt to Effect a Plan of Reorganization Through a Purported Section 363 Sale Highlights the Practical Value of Observing Chapter 11's Confirmation Requirements in a Case Like This**

35. The proposed transaction goes well beyond anything stated in or even arguably contemplated by 11 U.S.C. § 363. See, e.g., WestPoint Stevens, 33 B.R. at 51 ("Nothing in . . . Section 363 . . . provides the Bankruptcy Court with authority to impair the claim satisfaction rights of objecting creditors or to eliminate the replacement liens granted . . . in connection with the Section 363(b) sale."); Braniff, 700 F.2d at 940 (transaction providing for release of claims was not a "use, sale or lease" and thus was not authorized under § 363(b)).

---

[3] The terms the proposed transaction constitute an impermissible sub rosa plan in another respect. MP, through the terms of the settlement agreement referenced in paragraph 18 above, improperly seeks to distribute value to the second-lien lenders over the rights of the Lenders in contravention of the "absolute priority rule". See 11 U.S.C. § 1129(b).

36. Such a transaction would require observance of Chapter 11's plan confirmation requirements. For example, "at least two-thirds in amount and more than one-half in number" of at least one class of impaired claims must affirmatively accept the plan. See 11 U.S.C. §§ 1126(c),1129(a)(10). That voting requirement is relevant here, given that the dissenting Lenders hold at least 40% of the First-Lien Loans. In addition, creditors (except -- possibly -- MP and other members of the 51% MP Lender Group) have no clear idea how the proposed transaction would be accomplished. Under 11 U.S.C. § 1125(b), a disclosure statement determined to contain "adequate information", along with a copy of the plan or a summary, must be provided to holders whose votes are to be solicited. That information must be sufficient to permit an "informed judgment" about the plan. Id. § 1125(a)(1). In the absence of such information here, a substantial portion of the Lenders -- at least 40% -- are not convinced that the proposed transaction is appropriate and are therefore objecting.

37. Individual Lenders did not agree to forfeit the right to vote on a proposed plan -- Section 9.09 of the Credit Agreement specifically provides that the Administrative Agent may not "consent to or accept or adopt on behalf of any Lender any plan of reorganization . . . affecting the Obligations or the rights of any Lender or . . . vote in respect of the claim of any Lender" in bankruptcy or similar proceedings.

38. The Debtors and MP seek to convert secured claims into equity of a newly-formed company, over the objection of holders, and to effectively terminate the proceeding, all without observing any of Chapter 11's requirements for confirming plans. Those requirements are more than mere formalities, and this case underscores their utility and the resulting harm to creditors and the reorganization process if they are ignored.

### C. The First Lien Term Loan Documents Do Not Authorize the Administrative Agent to Effect the Proposed Transaction Without Each Lender's Consent

39. Even if the proposed transaction were permissible under Section 363, BONY, as Administrative Agent, is not authorized to effect it on behalf of all Lenders without their consent.

40. The unfair nature of the transaction, whereby dissenting Lenders are supposed to choose between an in-kind distribution of a minority equity interest in the purchaser on unspecified terms or cash in an amount equal to approximately 18.8% of the face amount of their secured claims, is incompatible with provisions in the loan documents that require equal and ratable distributions to, and sharing of amounts received among, the Lenders. Section 2.11 of the Credit Agreement, entitled "Sharing of Payments by Lenders", provides:

> If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of the Loans made by it resulting in such Lender's receiving payment of a proportion of the aggregate amount of such Loans and accrued interest thereon greater than its Pro Rata Share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders <u>ratably in accordance with their respective Pro Rata Share</u> . . . .[4]

41. The principle of ratable sharing is reflected elsewhere in the loan documents as well. See, e.g., Credit Agreement §§ 2.05 ("Repayment of Loans") (Borrower "shall repay to the Administrative Agent <u>for the ratable account of the Lenders</u> the aggregate principal amount of Loans") (emphasis added), 8.03 ("Application of Funds") ("After the exercise of remedies provided for in Section 8.02 . . ., any amounts received on account of the Secured Obligations

---

[4] (Emphasis added.) "Pro Rata Share" is defined in Section 1.01 to mean: "with respect to each Lender as of any date, . . . a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the aggregate outstanding principal amount of the Loans of such Lender and the denominator of which is the aggregate outstanding principal amount of the Loans of all Lenders, in each case on such date." The Credit Agreement and the Security Agreement were filed with the SEC by Foamex International, Inc. on April 2, 2007, as exhibits to an annual report on Form 10-K; copies are attached hereto as Exhibits B and C.

from proceeds of Collateral shall be applied by the Administrative Agent in the following order"; setting forth distribution priorities which, as to the Lenders, are "ratable", including "Fourth, to payment of that portion of the Obligations constituting unpaid principal of the Loans <u>ratably among the Lenders</u>") (emphasis added); Security Agreement § 4.1 (in representation as to ownership of pledged collateral, referring to "the security interest granted to the Collateral Agent <u>for the ratable benefit of the Secured Parties</u> pursuant to this Agreement") (emphasis added).

42. The foregoing provisions require equal treatment in making distributions to the Lenders and cannot be squared with the proposed sale transaction's disparate treatment of Lenders. Nor can it reasonably be said that the Lenders are treated equally because each has the "choice" to receive equity or cash. The value of the equity -- whose terms have not even been explained -- is less than shares issued to the controlling group, and the cash option is to be arbitrarily discounted. See ¶¶ 21, 25 supra. The cases cited by MP regarding a syndicate lender's inability to exercise remedies unilaterally, see MP Obj. ¶ 18, actually support Wayzata's argument that the loan documents require equal and ratable distributions and do not contemplate a transaction like this one. See, e.g., Credit Francais Int'l, S.A. v. Sociedad Financiera de Comercio, 490 N.Y.S.2d 670, 682 (1985) (agreement among bank consortium sought to prevent "individual banks working at cross purposes for their own individual benefit"). The loan documents require disproportionate recoveries by Lenders to be turned over and shared ratably -- they do not permit Lenders to appropriate value at the expense of other creditors through a purported exercise of remedies.

43. In addition, nothing in the loan documents supports MP's suggestion that the Administrative Agent may create "a vehicle . . . to hold the Debtors' assets", see MP Obj. ¶ 10, let alone a vehicle under the control of a group of Lenders following satisfaction of the debt. In

fact, the Credit Agreement only permits delegation of duties by the Administrative Agent to "sub-agents" and "Related Parties", neither of which includes a vehicle controlled by the 51% MP Lender Group. See Credit Agreement § 9.05 ("Delegation of Duties"); id. § 1.01 ("Related Parties" means "with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, attorneys, accountants, trustees and advisors of such Person and of such Person's Affiliates").

44. Moreover, the Credit Agreement specifically prohibits certain aspects of the proposed transaction without first obtaining each Lender's consent. For example, under Section 10.01(c) of the Credit Agreement any amendment, waiver or consent is ineffective if it purports to "reduce or forgive the principal of, or the rate of interest specified herein on, any Loan, or any fees or other amounts payable . . . under any . . . Loan Document or change the form or currency of payment without the written consent of each Lender directly affected thereby." Accepting MP's offer here would result in payment in kind of securities rather than cash payment of the First-Lien Loans as required by the Credit Agreement. Accordingly, the form of payment would be changed without each Lender's consent, in direct contravention of the Credit Agreement.

45. Furthermore, none of the provisions of Section 9.1 of the Security Agreement cited by MP authorizes a credit bid without a Lender's consent. See MP Obj. ¶ 18. Subsection (i) of Section 9.1 of that agreement permits the Collateral Agent to take possession of Pledged Collateral and to enter on a Pledgor's property to remove it. Subsection (ii) permits the Collateral Agent to collect and receive money or property from third-party obligees in respect of Pledged Collateral, and in connection therewith to extend the time for payment or otherwise compromise, extend or modify the relevant terms. Subsection (iv) permits the Collateral Agent to take possession of Collateral by directing delivery by a Pledgor. None of these provisions even

arguably authorizes BONY to credit bid a Lender's indebtedness in a Section 363 auction without that Lender's consent.

46. MP relies on GWLS Holdings, Inc., No. 08-12430 (PJW), 2009 WL 453110 (Bankr. D. Del. Feb. 23, 2009), a case involving a holder of less than 1% of the secured debt, which is distinguishable on its facts. Contrary to MP's suggestion, GWLS did not hold that administrative agents can act without unanimous consent in all instances -- instead it applied normal contract interpretation principles and found that the agreements in question there permitted action by the agent. Here, the dissenting Lenders have at least 40% of the debt and are faced with a transaction that directly violates the loan documents -- which differ from those at issue in GWLS -- if effected without consent.

47. In sum, the loan documents do not support giving the dissenting Lenders the choice between receiving unregistered equity securities, whose value is unknown but certainly less than those to be distributed to the 51% MP Lender Group, or cash of approximately 18.8% of the debt claims.

## CONCLUSION

48. For the foregoing reasons, Wayzata respectfully requests that the motion be denied, that the auction be re-opened, that credit bidding require a "cash out" option that is based on a notional value equal to the full amount of the credit bid, and that the Court grant such other relief as may be just and equitable.

Dated: May 26, 2009
Wilmington, Delaware

ASHBY & GEDDES

/s/ William P. Bowden

William P. Bowden (#2553)
Gregory A. Taylor (#4008)
500 Delaware Avenue, 8th floor
Wilmington, DE 19801
Phone # (302) 654-1888
Fax # (302) 654-2067

and

FAEGRE & BENSON LLP
Michael R. Stewart
Bruce M. Engler
2200 Wells Fargo Center
90 S. Seventh Street
Minneapolis, MN 55402-3901
Phone # (612) 766-7000
Fax # (612) 766-1600

Attorneys for Wayzata Investment Partners LLC, Wayzata Opportunities Fund II, L.P. and Foam Holdings, LLC

fb.us.4032104.08